### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **AMBER E. WHITE,** | : | |
| *Plaintiff* | : | |
| **v.** | : | **C.A. No. 21-cv-** |
| | : | |
| **AMERICAN CENTER FOR** | : | |
| **BIOREGULATORY MEDICINE AND** | : | |
| **DENTISTRY, LLC d/b/a THE** | : | |
| **BIOMED CENTER, alias,** | : | |
| *Defendant* | : | |

### COMPLAINT

### I.    Introductory Statement

1.      This action is brought by Plaintiff Amber E. White ("Plaintiff") against her former employer, American Center for Bioregulatory Medicine and Dentistry, LLC d/b/a The BioMed Center, alias, ("Defendant" or "BioMed") seeking compensatory, liquidated, and punitive damages, civil penalties, counsel fees, costs and other equitable relief arising out of violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., the Rhode Island Payment of Wages Act ("RIPWA"), R.I. Gen. Laws § 28-12-1, *et seq*., § 28-14-1, *et seq*. and § 25-3-1 *et seq.*, the Rhode Island Whistleblower Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1, *et seq*., and the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1, *et seq.*

### II.    Parties

2.      Plaintiff Amber E. White is a resident of the Town of Glocester, County of Providence, and State of Rhode Island.

3.      At all times relevant to this action, Plaintiff was an employee within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA and R.I. Gen. Laws § 28-12-2(5) and § 28-14-1(2) of the RIPWA employed by Defendant.

4.      Defendant American Center for Bioregulatory Medicine and Dentistry, LLC d/b/a The BioMed Center, alias, ("Defendant" or "BioMed") is a domestic limited liability company

duly registered under the laws of the State of Rhode Island, which is doing business in the State of Rhode Island, with a principal place of business located at 111 Chestnut Street, Providence, Rhode Island, 02903.

5.      At all relevant times, Defendant BioMed was Plaintiff's employer within the meaning of 29 U.S.C. §§ 203(a) and 203(d) of the FLSA and R.I. Gen. Laws § 28-12-2(7) and § 28-14-1(3) of the RIPWA.

### III.      Jurisdiction

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367, 2201 and 2202.

### IV.      Venue

7.      Venue is proper in this Court insofar as, on information and belief, Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. § 1391.

8.      Venue is also proper because all of the acts and/or omissions giving rise to the claims herein occurred in the District of Rhode Island.

### V.      Material Facts

9.      At all relevant times, Defendant BioMed was a private company offering bioregulatory, medical, and dentistry services out of an office in Providence, Rhode Island.

10.      Plaintiff was hired by Defendant in December 2018 and worked mostly full time until her termination on September 30, 2021.

### Employment Background

11.      Plaintiff was first hired by BioMed in December 2018 as a Dental Hygienist at $37 per hour plus benefits.

12.      While Plaintiff was a Dental Hygienist, she was the only dental employee besides that General Dentist, and she often performed the tasks of a dental assistant, administrator and

support staff.

13.    When Plaintiff's direct supervisor, Juliana Rowland (COO), left her role in October 2019, Plaintiff was promoted to the Dental Practice Manager and her pay rate was increased to $42 per hour plus benefits.

14.    Plaintiff received another pay raise in March 2021 to $45 per hour plus benefits.

15.    As Dental Practice Manager, Plaintiff worked as the dentistry manager for Well Rooted Dentistry, a department of Defendant BioMed, which included managing the dentistry office, hiring and training new staff, handling patient communications, scheduling, financial counseling, working closely with Defendant's full-time dentist, Dr. Sylvia Zannis, performing supervisor duties and responsibilities, development of dental operating policies and procedures, and generally ensuring the dental office ran smoothly.

16.    Plaintiff was also part of both Administrative and Clinical teams addressing internal concerns, vetting of decision making, hiring and firing of personnel, production goals and strategies, compliance, and quality assurance involving Defendant's two other departments, Vitality IV, offering various vitamin and other IV treatments, and BioEnergetics, offering holistic medical and naturopathic services.

17.    In addition to these responsibilities, soon after being hired, Plaintiff became responsible for receiving and responding to all off-hours and weekend patient and emergency calls and emails for the Well Rooted Dentistry, for which work Plaintiff was not compensated.

18.    Shortly after her hiring, Plaintiff also became responsible for all managing all websites and social media content for both Well Rooted Dentistry and Defendant BioMed after regular work hours, for which Plaintiff was not compensated.

19.    Beginning in 2018, when Plaintiff was first asked to manage the emergency call line on off-hours and weekends by the then Chief Operations Officer, Juliana Rowland, Plaintiff

inquired about compensation for those additional work hours.

20.     Plaintiff was initially told that it would be looked into, but Defendant never brought it up again.

21.     Throughout her employment, Plaintiff repeatedly raised the issue of being compensated for off-hours work and managing social media in Administrative Team Meetings with Michael Delmonico ("Mr. Delmonico"), Director and Compliance Consultant for BioMed, Amber Eusebio ("Ms. Eusebio"), BioMed's Administrator, and Cara Barry ("Ms. Barry"), BioMed's Patient Advocate; however, Plaintiff's complaints were either brushed off or she was told that BioMed was a start-up, had no additional money, and Plaintiff was asked to do this extra work to help out.

22.     However, after another employee who had been handling medical's social media accounts was fired, Ms. Eusebio asked Plaintiff for advice on how to manage the accounts going forward.

23.     Plaintiff responded that she could manage them, but she was not willing to take on any additional uncompensated work.

24.     Instead, BioMed hired and paid a new part-time employee to do medical's social media work.

### January 2021 Protected Conduct/Reports of Violations of Law

25.     During her employment, Plaintiff observed numerous activities of Defendant that Plaintiff reasonably believed to be violations of federal and state laws, rules, or regulations.

26.     In response, Plaintiff raised numerous safety and legal concerns to Defendant's managers, including Mr. Delmonico, Ms. Eusebio, and Ms. Barry in the hope that Defendant would change its conduct and begin complying with legal requirements placed on the business.

27.     Specifically, in January 2021, Plaintiff observed an employee of BioMed

receiving an IV treatment through Vitality IV during working hours, which Plaintiff believed was very odd since the employee was not a patient of BioMed.

28.     Plaintiff could not find any medical history, medical order or documentation of the treatment provided to that employee, all of which were required by Department of Health (DOH) regulations.

29.     Plaintiff decided to investigate the issue, conducting an audit of Vitality IV's treatment records, and discovered that many employees were receiving undocumented IV treatments without required lab reports or physician orders for such treatment.

30.     During a team meeting in either January or February 2021, Plaintiff brought up her discovery, explaining that Vitality IV was violating numerous DOH regulations by providing undocumented treatments to employees.

31.     Plaintiff was not told how the issue would be addressed, but she believes that BioMed stopped improperly treating employees as a result of her complaint.

32.     On various occasions in the last two to three months of Plaintiff's employment, Dick Thom, D.D.S., N.D. ("Dr. Thom") treated dentistry patients in a manner that was beyond the scope of his Rhode Island license authorizing him to practice naturopathic medicine.

33.      Under Dr. Thom's license, he was only permitted to practice medicine under the supervision of a licensed M.D. or D.O. and was not licensed to prescribe medication.

34.     Nonetheless, at the end of August 2021, while Dr. Zannis was on vacation, Dr. Thom reviewed dental x-rays for one of Dr. Zannis' patients, told the patient that Dr. Zannis' diagnosis was wrong, provided a contrary diagnosis of the patient's tooth ailment, and advised the patient not to take any action as the ailment would resolve itself.

35.     When the patient was in extreme pain a few days later, she called Plaintiff in tears and explained the unlicensed treatment provided by Dr. Thom.

36.     Plaintiff approached Dr. Thom about his unlicensed treatment, but he smugly responded that she could address the dental patient as she saw fit, without acknowledging that he had done anything wrong.

37.     In September 2021, Dr. Thom met with another one of Dr. Zannis' patients and advised her against taking an antibiotic prescribed by Dr. Zannis.

38.     After each incident, Plaintiff complained to Ms. Eusebio and Mr. Delmonico that Dr. Thom was treating patients beyond the scope of his Rhode Island license and suggested that the issue be brought up in their Clinical Team Meeting, where issues of compliance were usually addressed.

39.     In response, Ms. Eusebio and Mr. Delmonico told Plaintiff that they did not want her to bring up the issues with Dr. Thom during those meetings.

40.     Upon information and believe, Ms. Eusebio and Mr. Delmonico took no action to address Dr. Thom's unlicensed practice of medicine and dentistry.

### *September 2021 Protected Conduct/Reports of Violations of Law*

41.     Later in September 2021, Plaintiff learned of another patient who had been instructed not to take a prescribed antibiotic by Dr. Thom.

42.     When she again complained to Ms. Eusebio and Mr. Delmonico, all they said was "oh jeez, another one."

43.     On August 17, 2021, the Rhode Island DOH issued an emergency rule, which became immediately effective, establishing a requirement for all workers of health care facilities and providers with direct contact with patients to be vaccinated against COVID-19 by October 1, 2021 (COVID-19 Vaccine Mandate).

44.     The COVID-19 Vaccine Mandate applied to any "Health care worker," which was defined as "any person who is temporarily or permanently employed by or at, or who serves as a

**Page 6 of 21**

volunteer in, or has an employment contract with, a health care facility, and has or may have direct contact with a patient in that health care facility. This may include, but not be limited to, a physician, physician assistant, nurse, nursing assistant, therapist, technician, clinician, behavioral analyst, social worker, occupational, physical or speech therapist, phlebotomist, emergency medical service practitioner, dental personnel, pharmacist, laboratory personnel, autopsy personnel, students and trainees, contractual staff not employed by the health-care facility; other health care providers, including those who have privileges at, but are not employed by, the health care facility; and persons (e.g., clerical, dietary, housekeeping, laundry, security, maintenance, administrative, billing, and volunteers) not directly involved in patient care but potentially exposed, in the course of employment, to infectious agents that can be transmitted from person to person."

45.     On August 26, 2021, Plaintiff attended a Clinical Team Meeting where the regulations on COVID-19 Vaccine Mandate were reviewed and discussed.

46.     The Team decided that Ms. Eusebio would prepare a BioMed-wide notice for all employees and contractors and would conduct an audit of which employees and contractors were vaccinated within the next week.

47.     Following that meeting, both Plaintiff and Dr. Zannis informed BioMed that they were not vaccinated, did not plan to get vaccinated, and were morally and religiously opposed to the COVID-19 vaccines.

48.     Thereafter, a Dental Contingency Plan (the Plan) was developed to ensure compliance with the COVID-19 Vaccine Mandate and maintain operations of the Dental office.

49.     On September 14, 2021, Plaintiff met with Dr. Zannis, Mr. Delmanico and Ms. Eusebio to discuss the Plan, which included notifying all dental patients of BioMed's plans for complying with the Mandate and ensure continuity of care, referring short term patients to

covering physicians, and continue with a prior plan to hire a new General Dentist.

50. This plan included that Dr. Zannis and Plaintiff would be responsible for all patient communications and would work remotely from home beginning on October 1, 2021.

51. Plaintiff made numerous complaints about the Plan's compliance with DOH regulations, including that the Dental Hygienists would still be working under Dr. Zannis' dental license, and that DOH regulations prohibited Dental Hygienists from seeing new patients without a dentist in the office.

52. Since the Dental Hygienists were scheduled to work on Mondays and Wednesdays, and BioMed had so far only contracted with a new dentist to work on Mondays and Thursdays, they would not be permitted to see new patients or diagnose x-rays on Wednesdays.

### *Retaliation for Engaging in Protected Conduct*

53. On that same day, Plaintiff and Dr. Zannis were told by Mr. Delmonico that they were no longer welcome to attend the Biohacking conference that Plaintiff had organized, scheduled for September 16-19 in Florida, because of her vaccination status.

54. Plaintiff and Dr. Zannis were replaced by Supplement Coach, Jaimie Dufresne ("Ms. Dufresne") and Independent Contractor, Christine Dionese (Ms. Dionese"), neither of whom were vaccinated when they attended the conference.

55. Around that same time, Plaintiff learned from Ms. Dionese that Ms. Eusebio had not contacted some or all of BioMed's independent contracts to obtain their vaccination status, and Ms. Dionese and another independent contractor, Christina Chevalier told Plaintiff they had no intention of getting vaccinated either, but were not planned to be terminated by BioMed.

56. Plaintiff also leaned that BioMed had given Ms. Dufresne a medical exemption from the requirement to be vaccinated by October 1, 2021, despite that BioMed had already informed staff that they would not be giving medical exemptions for any medical conditions not

expressly included in the Mandate, which did not include Ms. Dufresne's medical condition.

57.    Plaintiff complained to both Mr. Delmonico and Ms. Eusebio that they were not complying with the Mandate, including by granting Ms. Dufresne's exemption and by not contacting independent contractors for their vaccination status.

58.    Both Mr. Delmonico and Ms. Eusebio refused to discuss the Vaccine Mandate with Plaintiff when she raised these concerns.

### Request for Religious Accommodation

59.    On September 20, 2021, Plaintiff submitted a request for a Title VII religious exemption to the Vaccine Mandate by email to Mr. Delmonico and Ms. Eusebio, requesting a reasonable accommodation and a meeting to determine what accommodations might be available.

60.    Verbally, Plaintiff offered to continue working in-person, wear masks, conduct weekly testing, and social distance.

61.    After receiving no response to her request, Plaintiff sent a follow-up email suggesting an alternative accommodation to work remotely.

62.    Since Plaintiff had previously worked remotely while BioMed was closed at the beginning of the Pandemic, from May 2020 to July 2020, Plaintiff knew that she could efficiently and effectively complete all of her job duties remotely.

63.    Plaintiff had decided not to take a COVID-19 vaccine because she is Catholic and the vaccines were developed and produced using fetal cells, tested using fetal cells, or both, which was contrary to Plaintiff's own strongly held religious belief against abortion and use of fetal cells in medicine.

64.    On September 22, 2021, an email was sent to all patients notifying them of the vaccine mandate and BioMed's plan to support patients, informing patients that BioMed had

been granted a 30-day extension to come into compliance with the Mandate to ensure continuity of care.

65.    Specifically, the email explained, "Importantly, the Center's medical consulting team (led by Dr. Drobot, Dr. Thom, and Nurse Practitioner Joyce Martin), its infusion and nursing team (led by registered nurse Anthony Spardello), its supplements services (led by health coach Jaimie Dufresne), and its patient advocacy services (led by registered nurse Cara Barry) will all be here to support you as needed during the transition."

66.    The email notice was signed by Ms. Eusebio and Dr. William Beliveau, neither of whom consulted with Plaintiff or Dr. Zannis before sending the email to their dental patients.

67.    Because the email notice made no mention of Dr. Zannis or any dental staff, Plaintiff immediately received an influx of calls and emails from very upset patients complaining that the notice that BioMed would be complying with the Mandate was contrary to the principles of bioregulatory medicine, natural health, and freedom of choice.

68.    On September 27, 2021, Plaintiff attempted to schedule a meeting with the other administrators and board members to discuss patient feedback, but was declined in an email from Michael Baldwin, BioMed's Board Member and effective President.

### *Discriminatory and Retaliatory Employment Action*

69.    On September 28, 2021, two days prior to Plaintiff's planned last day in the office according to the Dental Contingency Plan, Plaintiff was called into an impromptu meeting with Ms. Eusebio and Ms. Barry, wherein she was directed to immediately pack up her things and work from home for the rest of the week.

70.    Ms. Eusebio and Ms. Barry told Plaintiff that they would contact her on September 30th with more information.

71.    When Plaintiff asked how this change affected the Dental Contingency Plan in

place, Plaintiff was met with extreme hostility and simply told, "We'll let you know on Thursday."

72.     Plaintiff was then told by Ms. Barry that she was no longer a part of the Administrative Team and was being told to leave immediately.

73.     When Plaintiff went to her desk to pack up her things, she discovered that there was an unscheduled dental patient waiting to be seen, but both of the Dental Assistants, Sandra Bernal and Ashlyn Barry, had left the building.

74.     Because Plaintiff believed it would be unprofessional and inappropriate to leave the office when Dr. Zannis had no support staff, Plaintiff waiting until the Dental Assistants returned to their duties.

75.     In her position as the Dental Practice Manager, Plaintiff told the Dental Assistants that she was concerned with them both leaving while patients were being treated and the necessity to report to their direct supervisors, herself and Dr. Zannis, for permission to leave the office during work hours.

76.     At that point, Plaintiff finished packing her things and as she was ready to leave, Ms. Eusebio returned with Joyce Martin ("Ms. Martin"), a Nurse Practitioner, and Anthony Spardello, a nurse; Ms. Martin told Plaintiff that she was now "upsetting the staff," that the patients could not take the stress and Plaintiff must leave immediately.

77.     Plaintiff felt very intimidated and bullied in that moment, and extremely confused as to why she was being treated with such hostility and why the other Administrators had decided to depart from the Dental Contingency Plan they already had in place.

78.     Plaintiff worked remotely from home for the remainder of the day and through September 30, 2021, the day that she was supposed to begin working remotely.

79.     On September 30, 2021, Plaintiff received a termination letter ending her

termination and health benefits immediately in light of the Mandate and the fact that Plaintiff "elected to not get vaccinated against the Covid virus by 10/01/21."

80.    Upon information and belief, Dr. Zannis received the same termination letter on September 30, 2021, except that her termination did not become effective until November 1, 2021, as previously planned, and Dr. Zannis was permitted to continue working in-person throughout October.

81.    Plaintiff's termination letter expressly stated that her requested religious exemption was denied because it would allegedly create an undue burden on BioMed, because "Given the requirements of your job, including the need to be on site in which you interact on a daily basis with staff who are exposed to patients of the Center, any employee of the Center who is unvaccinated places at risk the health, safety and welfare of all other staff and patients, particularly given the ever-evolving virus variants."

82.    This explanation was plainly pretextual since Plaintiff had previously successfully completed all essential job functions while working remotely.

83.    Furthermore, on information and belief, Dr. Zannis was granted a religious accommodation to continue to work in-person in the dental office during her regularly scheduled hours without being vaccinated.

84.    Additionally, Defendant's termination letter to Plaintiff contradicted the previously established Dental Contingency Plan, in which Defendant had decided to permit Plaintiff to continue working remotely until at least November 1, 2021.

85.    Moreover,  Defendant's termination letter also omitted the fact that Defendant had already been permitted a 30-day extension on coming into compliance with the Mandate and was still within the compliance period.

86.    Therefore, Defendant's explanation for denying Plaintiff's requested reasonable

accommodation was merely a pretext for terminating an employee who had regularly complained about Defendant's pattern of violating state and federal laws and regulations.

87.     Even if Defendant believed that Plaintiff's position required her to interact with patients on a daily basis, the fact that a religious accommodation was granted to another employee to continue to work in the building unvaccinated, belies Defendant's false justifying for denying Plaintiff's accommodation.

88.     Defendant apparently wanted to be able to carry-on with their numerous and varied legal violations without being told that their conduct was illegal.

89.     Finally, upon information and belief, when no other employees were willing to staff the emergency call time after hours for no compensation, Defendant was required to hire a call service to monitor after-hours and weekend calls.

### *Whistleblower Act Violation*

90.     The Rhode Island Whistleblowers' Protection Act prohibits an employer from taking adverse action, including termination, against an employee "[b]ecause an employee refuses to violate or assist in violating federal, state or local law, rule, or regulation[.]"  R.I. Gen. Laws § 28-50-3(3).

91.     The Rhode Island Whistleblowers' Protection Act also prohibits an employer from taking adverse action, including termination, against an employee "[b]ecause the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of a law or regulation or rule promulgated under the laws of this state, a political subdivision of this state, or the United States […]."  R.I. Gen. Laws § 28-50-3(4).

92.     As described above, Plaintiff experienced adverse employment action by terminating her employment after she expressed numerous complaints to Defendant's

administrators between August and September 2021 over Defendant's state law violations, specifically including Defendant's naturopathic medical practitioner operating beyond the scope of his license, non-compliance with the COVID-19 Vaccine Mandate, violations of the FLSA for failure to compensate Plaintiff for all work performed, and other violations of various DOH regulations, among other legal violations.

93.     Defendants took adverse employment action against Plaintiff, in whole or in part, in retaliation for exercising her rights pursuant to the Act.

94.     Defendant's justification for terminating Plaintiff based on the COVID-19 Vaccination Mandate was clearly pretextual because Plaintiff was a) forced to leave the building two days prior to the original date of compliance, b) terminated 30-days prior to the extension granted to Defendant to come into compliance, c) terminated contrary to the plain language of the Mandate, which only applied to any worker who "has or may have direct contact with a patient in that health care facility," which of course did not apply to Plaintiff while she was working completely remotely, d) denied a religious accommodation when another employee in the Dental practice, namely Dr. Zannis, was granted a religious accommodation, and e) denied a religious accommodation based on alleged undue hardship that did not exist as Plaintiff previously performed her job fully remotely without any performance deficiency or negative impact on business needs.

95.     Defendant's wrongful and/or unlawful acts and/or omissions, including, but not limited to, those described herein, are in violation of the Act and were motivated by malice or ill will toward Plaintiff, and Defendant otherwise acted in bad-faith and/or with reckless indifference to the statutorily protected rights of Plaintiff.

### RICRA – Religious Discrimination

96.     Under the RICRA, "[a]ll persons within the state, regardless of race, color, religion,

sex, disability, age, or country of ancestral origin, have, …, the same rights to make and enforce contracts, to inherit, purchase, to lease, sell, hold, and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property." R.I. Gen. Laws § 42-112-1.

97.    At all relevant times, Plaintiff sincerely held a religious belief against use of vaccines, including the COVID-19 vaccines because of the use of cells derived from a fetus in the development and production, or testing, or both of the vaccines.

98.    Plaintiff requested that Defendant grant Plaintiff a religious accommodation to continue to work for Defendant without getting a COVID-19 vaccine.

99.    Soon after disclosing her sincerely held religious belief, Defendant took adverse employment action against Plaintiff by terminating her employment.

### *Defendants' Unlawful Compensation Scheme*

100.    Defendant is and, at all relevant times was, an enterprise within the meaning of 29 U.S.C. § 203(r).

101.    At all relevant times, Plaintiff was "engaged in commerce or in the production of goods for commerce" within the meaning of, *inter alia*, 29 U.S.C. §§ 203 (b), (i)-(j), 206(a), and 207(a), in her capacity as a Dental Hygienist and Dental Practice Manager employed by Defendants.

102.    At all relevant times, Defendant was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of, *inter alia*, 29 U.S.C. §§ 203(s).

103.    On or about December, 2018, Defendant hired Plaintiff as a Dental Hygienist at $37 per hour plus benefits.

104.    Beginning on October 8, 2019, Plaintiff was promoted to the Dental Practice Manager and her pay rate was increased to $42 per hour plus benefits.

105.    Plaintiff received another pay raise beginning on February 21, 2021 to $45 per hour plus benefits.

106.    At all relevant times, Plaintiff was a non-exempt hourly employee who was only paid for hours actually worked without a guaranteed minimum pay or salary.

107.    Plaintiff estimates that she worked approximately two (2) hours per week managing the dental emergency call-line during off hours and on weekends without being paid for that time throughout her employment with Defendant.

108.    Beginning in June 2019, Plaintiff estimates that she spent approximately five (5) hours each week without pay building and maintaining social media content on both Instagram and Facebook for The BioMed Center.

109.    Defendant only paid Plaintiff at an hourly rate throughout her employment and did not offer to or pay a minimum salary each week as required by 29 C.F.R. §541.602; thus, Plaintiff's employment did not satisfy the "salary basis" test, and she was therefore a non-exempt employee under the FLSA and the RIPWA throughout her employment for Defendant.

110.    Plaintiff worked over forty (40) hours on several weeks during her employment, which was reflected on her paystubs.

111.    For the unrecorded hours that Plaintiff worked over forty (40) hours each week, she was not paid a premium payment of time and one-half.

112.    For example, during the pay period ending February 22, 2020, Plaintiff's paystub reflects that she worked eighty (80) hours in two weeks, was paid an overtime premium for only 0.75 hours, was not paid her standard hourly rate for fourteen hours worked and was not paid an overtime premium for 13.25 hours.

### *Minimum Wage and Overtime Pay Violations*

113.    At all relevant times, Plaintiff was a non-exempt employee entitled to payment of

a minimum wage under applicable law, wages for all hours worked, and overtime wages as defined under the FLSA and RIPWA.

114.    In light of all the relevant facts previously alleged above, Plaintiff accepted employment with Defendants based on an agreed-to hourly rate of $37 (from December 2018 through September 7, 2019), $42 (from September 8, 2019 through February 20, 2021) and $45 (from February 21, 2021 through September 30, 2021.

115.    Plaintiff was entitled to compensation in an amount equal to the agreed-to hourly rate as prescribed by the FLSA and RIPWA for all hours worked and overtime compensation equal to one and one-half (1 ½) times the agreed upon regular hourly rate for all hours over forty (40) and hours worked on Sunday and on holidays.

116.    Defendant willfully, intentionally, and repeatedly violated the FLSA and RIPWA by failing or refusing to compensate Plaintiff for all hours in an amount equal to the agreed-upon hourly rate prescribed by the FLSA and RIPWA for straight time hours worked from December 2019 through September 30, 2021 as previously alleged herein.[1]

117.    Defendant willfully, intentionally, and repeatedly violated the FLSA and RIPWA by failing or refusing to compensate Plaintiff the legally required overtime pay of one and one-half (1 ½) times her regular rate of pay for all hours worked over forty (40) in a workweek and hours worked on Sunday and on holidays for the workweeks from December 2019 through September 30, 2021 as previously alleged herein.

---

[1] It is black letter law that an employee of a private employer may not "volunteer," in whole or in part, to perform work for his or her employer, insofar as an employee may not waive his or her right to minimum wage and overtime pay due under the FLSA.  *See Barrentine v. Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 740 (1981); *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697 (1945). Nor may FLSA rights be abridged, waived, or modified by contract or custom. *See Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 602-03 (1944)("***The Fair Labor Standards Act was not designed to codify or perpetuate those customs and contracts which allow an employer to claim all of an employee's time while compensating him for only a part of it.*** Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act.  Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights.")(emphasis added; footnote omitted).

*Work Suffered or Permitted*

118.    Defendant is liable for the payment of compensation for all hours worked and overtime wages for all hours over forty (40) that Plaintiff was "suffered or permitted to work" in any one workweek—regardless of whether the work was requested, authorized, or needed—whenever Defendant knew or had constructive knowledge that the work was being performed.

119.    Defendant knew or had reason to believe that Plaintiff was performing work and overtime work for which she was not being compensated.

120.    Moreover, Defendant knew or had reason to believe that Plaintiff was working in excess of forty (40) hours per week on a regular basis.

121.    Accordingly, Defendants had constructive, if not actual, knowledge that Plaintiff regularly performed work and overtime work for which she was not compensated.

122.    Nevertheless, Defendants failed or refused to pay Plaintiff the compensation to which she was legally entitled for all hours and overtime hours worked calculated based on her regular rate of pay.

*Harm*

123.    As a proximate result of Defendants' wrongful, intentional, unlawful, discriminatory, and/or retaliatory acts and/or omissions, including, but not limited to those described herein, Plaintiff suffered, is now suffering, and will continue to suffer emotional and economic injury including, but not limited to, pecuniary losses, loss of income, loss of front and back pay, loss of employment benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, damage to her professional and personal reputation, and has incurred and will continue to incur expenses for legal services, and other great harm.

## VI.     Claims for Relief

124.     Plaintiff incorporates in the counts below the allegations contained in ¶¶1 through 123 above.

### Count One
### *Rhode Island Whistleblower Protection Act,*
### *R.I. Gen. Laws § 28-50-1, et seq.*

125.     Defendant, by its individual and/or concerted acts or omissions, including, but not limited to those described herein, engaged in unlawful retaliation against Plaintiff in violation of the RIWPA, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the RIWPA.

### Count Two
### Rhode Island Civil Rights Act of 1990
### *R.I. Gen. Laws § 42-112-1, et seq.*

126.     Defendant, by its acts and/or omissions, including, but not limited to those described herein, engaged in unlawful discrimination on the basis of Plaintiff's religion, and thereby wrongfully interfered with Plaintiff's contract of employment in violation of the RICRA, causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the RICRA.

### Count Three
### *Federal Labor Standards Act*
### *29 U.S.C. § 201, et seq.*

127.     Defendants, by their acts and/or omissions, including, but not limited to those described herein, violated the FLSA by failing to pay Plaintiff for all hours worked and for all overtime hours worked, calculated at time and one-half her regular rate as provided therein, thereby causing Plaintiff to suffer damages as aforesaid, for which she is entitled to relief pursuant to 29 U.S.C. § 216(b).

### Count Four
### *Rhode Island Payment of Wages Act,*
### *R.I. Gen. Laws § 28-12-1, et seq., § 28-14-1, et seq., and § 25-3-1 et seq.*

128.   Defendants, by their acts and/or omissions, including, but not limited to those described herein, violated the RIPWA by failing to pay Plaintiff for all hours worked and all overtime worked, calculated at time and one-half of her regular rate as provided therein, thereby causing Plaintiff to suffer damages as aforesaid, for which she is entitled to relief pursuant to R.I. Gen. Laws § 28-14-19.2, § 28-14-20, and § 25-3-9.

### VII.   Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1.   A declaratory judgment declaring that the acts and/or omissions of Defendants, including, but not limited to those complained of herein, are in violation of the RIWPA, RICRA, the FLSA, and the RIPWA.

2.   An injunction directing Defendants to take such affirmative action as is necessary to refrain from such conduct as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated.

3.   An award of all unpaid wages.

4.   An award of compensatory damages.

5.   An award of punitive damages.

6.   An award of liquidated damages pursuant to 29 U.S.C. § 216(b).

7.   An award of liquidated damages in an amount two times the amount of wages and and/or benefits owed pursuant to R.I. Gen. Laws § 28-14-19.2 and § 28-14-20.

8.   An award of reasonable attorney's fees and costs of litigation pursuant to 29 U.S.C. § 216(b).

9.      An award of reasonable attorney's fees and costs pursuant to R.I. Gen. Laws § 28-14-19.2 and §28-14-20.

10.     An award of reasonable attorney's fees and costs pursuant to R.I. Gen. Laws § 25-3-9.

11.     An award of other appropriate equitable relief pursuant to 29 U.S.C. § 216(b).

12.     An award of other appropriate equitable relief or penalties pursuant to R.I. Gen. Laws § 28-14-19.2 and §28-14-20.

13.     An award of such other and further relief as this Honorable Court deems just and proper.

## VIII.  <u>Demand for Jury Trial</u>

Plaintiff hereby demands a trial by jury on all counts so triable.

## IX.     <u>Designation of Trial Counsel</u>

Plaintiff hereby designates Richard A. Sinapi, Esquire and Danilo A. Borgas, Esquire, as trial counsel.


Plaintiff,
By her attorneys,
**SINAPI LAW ASSOCIATES, LTD.**

**Date:  December 7, 2021**          <u>/s/ **Danilo A. Borgas**                          </u>
**Danilo A. Borgas, Esq. (#9403)**
**Chloe A. Davis, Esq. (#9334)**
**Richard A. Sinapi, Esq.  (#2977)**
2374 Post Road, Suite 201
Warwick, RI 02886
Phone:  (401) 739-9690
FAX:  (401) 739-9040
dab@sinapilaw.com
cad@sinapilaw.com
ras@sinapilaw.com